Rodriguez, and Moore. And first, we'll call Mr. Cole. Your Honor, my name is Warren Cole. I represent Rinaldo Berrios. I have been given seven minutes. I would like to take two minutes for rebuttal. Your Honor, I have raised three issues, double jeopardy with respect to the consecutive life terms, the propriety of the carjacking instruction, and the admission of ammunition and evidence of possession of ammunition and evidence. First of all, the double jeopardy claim. Your Honor, on Friday I submitted a Rule 28J letter because I discovered very belatedly and apologetically a Virgin Islands statute that may apply. It's 14 Virgin Islands Code Section 84, which says that when an act is declared a crime within the jurisdiction of any court other than the Virgin Islands, and there is a conviction or an acquittal of that act, it is a barred prosecution in the Virgin Islands. Isn't that very similar, though, to a federal rule called the Pettit Rule, that the federal government will pursue an action where there's already been an action taken in the state? It seems to me, though, you have . . . this wasn't a second prosecution, was it? This was a contemporaneous prosecution. Well, yes, Your Honor, but it seems to me . . . well, there are a number of issues raised by the statute. I mean, the question . . . one of the questions that one might ask for that statute is whether or not the District Court of the Virgin Islands is, in fact, a Virgin Islands court or something else, which has never been answered, I think, to my satisfaction, certainly. But having raised the . . . you know, having looked at the statute, thought that it might apply, I needed to raise it to the court. I would point out that if that court, in fact . . . if that statute can . . . is interpreted to bar the prosecution of the Virgin Islands homicide count, if he's previously convicted of a federal crime for the same homicide, then, obviously, we avoid the Fifth Amendment question. We also avoid the split in the circuits, which does exist with respect to Julian in the 11th Circuit and Dinwiddie and Battle in the 8th and 10th Circuits. So, I raised the statute. I think that it can be read to preclude a prosecution for a Virgin Islands homicide if he's been convicted for the same homicide under federal law, for what it's worth. Your Honor, with respect to the double jeopardy issue, however, I believe that the government has conceded tacitly that this does meet the blockburger test, that the felony murder under Virgin Islands law and the firearms murder under federal law are, in fact, the same crime, and unless there was congressional intent to impose consecutive sentences, that he can only be sentenced for one of those homicides. The government relies on Dinwiddie and Battle, which are 8th and 10th Circuit cases. I would only point out that the underlying statutory interpretation under Dinwiddie and Battle is that the homicide is not a violation of 924J. It is a violation of 924C enhanced by 924J. Julian holds the other way. Quite frankly, until I saw those cases, it never occurred to me that 924J was other than a separate crime. And I would also like to point out that, in fact, that's the way it was charged and instructed in this case. And in the government's own brief, in this appeal, they described the crime as a 924J violation, not as a 924C violation enhanced by 924J. So Dinwiddie and Battle is, in fact, inconsistent with the way this case was charged and tried from the very beginning and as it is characterized in the government's own brief. With respect to carjacking instruction, Your Honor, again, we believe that the instruction as given violated Holloway because it allowed the jury to find intent, conditional intent, to cause harm to the victim based merely upon the subjective understanding or subjective perception of the victim. Under Holloway, the means element of the crime has to be proven separately from the conditional intent element. We believe that the instruction as given allowed the jury to find conditional intent merely from the subjective point of view of the victim. The government claims, says that by using the word objective in the first clause in that instruction, that somehow corrected the problem of using, referring to the reasonable perception of the victim in the second clause. I merely point out that that is a contradiction in terms. Under Whitney v. Horn, the Third Circuit case, under Whitney v. Horn, the court points out that one does not cure defective instruction by making it contradictory, and I think that's what the judge did. With respect to the admission of ammunition, the current argument from the government that this evidence was properly admitted is a post hoc rationalization. It was never – they try to argue that it was a false exculpatory statement, but that was never argued that way at trial. At trial, it was purely argued as a means of attacking the credibility of the defendant, and it was only offered and argued for his untrustworthiness and as an attack on his character and to show connection with unlawful firearms. With respect to whether or not it was harmless error, I would point out that they have to demonstrate that it's highly probable that it did not contribute to the conviction. I don't believe they can do that because that was the only evidence in the case in which they connected Mr. Barrios with firearms and this was the firearms case. All right. We'll have you back on rebuttal. Thank you, Your Honor. Mr. King. Good morning, Your Honors. My name is Robert King, and I'm here on behalf of Angel Rodriguez. When we filed this appeal – Do you want any rebuttal time? Oh, yes, Your Honor. I'd like to reserve two minutes. Okay. Your Honor, in writing this brief, it appeared that there are two areas where, if it was to be successful, this appeal had to be based on. The first would be the insufficiency of evidence, and the second would be for prosecutorial misconduct. The first was what, Mr. King? It was insufficiency of evidence. Okay. And the second would have been for prosecutorial misconduct. When I talked about insufficiency of evidence, what I talked about had to do, hinged upon the admissibility of a recorded jailhouse conversation between Appellant Troy Moore and Appellant Rinaldo Barrios. The court, the counsel on behalf of Mr. Rodriguez, I did, objected to this testimony on several bases. First of all, that the recording was testimonial. The second basis was that it was hearsay offered for the proof of the matter asserted. The third was that the statement was not made in furtherance of any conspiracy, which means it didn't fall within any other exception to the hearsay rule. So it couldn't be 801b2e because the conspiracy was over and the statements weren't an attempt to keep the conspiracy covert. That is correct. So it didn't fall into any traditional exceptions to the hearsay rule. So in order to get around that, what the court did was it went to the exception under 807, and the court went to its finding that it was trustworthy because the two men did not know they were being questioned and did not know that they were subject to recording and all of this. But that doesn't cure the issues that come from the idea behind both the hearsay rule and the confrontation clause. Why wasn't it non-testimonial? Your Honor, I have trouble with trying to actually understand what is testimonial and what is not. I struggle with that. Join the crowd. Okay. I think I'm in good company. I think the court, in trying to figure out what was testimonial, the courts have basically said, okay, we're not going to tell you what is testimonial. Well, we're going to tell you a little bit of what's testimonial, but we're not going to limit what's testimonial, which means they haven't really told us anything. The courts have told us that testimony before a preliminary hearing, before a grand jury, or a trial, or before police interrogators are all testimony. But when you put two persons in a jailhouse setting and separate them by a wire fence in the hope of obtaining incriminatory statements, and that statement is for the purpose of being used at trial, not just against them, but anybody else who's mentioned, I have trouble with the idea that that's not testimonial. When the whole idea of confrontation is offended, at least in the case of Mr. Rodriguez, by the idea that he could have two persons speaking about him who he never has the opportunity to cross-examine because of a classification that something is either non-testimonial or testimonial. I think that the framers intended, and even the hearsay rule intends, that if it doesn't fall within some recognized exception, that a defendant is going to be able to test the truth of what's happening in the crucible of cross-examination. It does it by the procedure. The procedure that's required is not a judge's determination of whether or not it's reliable. Isn't the distinction one that if it's testimonial, there's a constitutional claim? And if it's non-testimonial, which the government argues in this case that this recording was, that then you have to make a determination whether or not it's clearly hearsay because it's hearsay under the definition. You've got to make a determination as to whether or not it's admissible as an exception to the hearsay rule. I agree with that. Isn't that really the issue here? It is. So you have to find how do you get it in as hearsay. Exactly. I say that there is no way to get it in as hearsay except under that broad exception which eats up the rule. If we rely upon the court's determination that something is trustworthy, then there's nothing left of the hearsay rule itself because the court says, well, it has specific indica of trustworthiness and they elicit a number of reasons. Reliability. Isn't that a test? Sure it is. Sure it is. It's against their interest. There's all kinds of reasons why you said it would be admissible as against them. But why would it be admissible as a third person? I think the prudent thing to have done would have been to sever out Mr. Rodriguez and to allow him to have his day untainted by the problems that were submitted by the recording itself. So you would analogize this to Bruton and say the reliability is as to the two speakers because you don't know the motive that speaker A has with regard to speaker B about person C. Speaker A might be trying to convince speaker B that C is really against the two of them. So you don't know what the motives behind either A's statement to B or B's statement to A is as to C or D or anyone else. Exactly. That's precisely the problem. That's precisely the problem that was addressed before this court. Did you ever file a motion to sever? No, Your Honor. At the trial of this action, what I did was I requested that the court exclude it. The court said it would not exclude it. I did not ask for a motion to sever at that point. So how do we review this? Under what standard? Well, I believe, first of all, the standard with respect to the evidentiary portion is abuse of discretion. That would be whether or not the hearsay rule applies. I believe that the other is a plenary review. That's a review as to whether or not the constitutional issues are properly before Your Honors and whether the judge acted properly under the Confrontation Clause. Now, the last, and I don't want to run into the problem, the problem that I next had was the prosecutorial misconduct. That came from a number of different things. It came from statements about the witness having sent mail from the jail, showing the witness in prison garb and chains, reciting of a poem. This is a highly charged case. It's a bad case. It's a case in which Officer Chapman lost his life. The recitation of the poem that is recited in the brief, the judge agreed was an appeal to passion and it was an appeal to prejudice. That appeal to passion and prejudice in view of this highly charged case and a case that was reported in the newspaper daily was such that it did not accord these defendants a fair trial under those circumstances. The jury felt that it had to do with civic duty in order to bring back a conviction. That was put upon them and brought to them by the prosecutor's statement made in closing argument. All right. Thank you. We'll hear from Mr. Rivers and we'll have you back on the ball. Thank you. Mr. Rivers? Good morning, Your Honor. Good morning. Your Honor, could I have one minute reserved? That request will be granted. Judge, I raise, Your Honor, I raise three issues in my appeal. The first one is that the court below committed error when it allowed the video recording from the jail to that the prosecutor closing arguments were prejudiced and is unfairly prejudiced and appealed to the sympathy of the jury. And the third one was that there was really not enough evidence to convict my client. The first thing I raise was that the oath given by Attorney Schneider to support the wiretap in the jail was on itself, on its face, defective. First of all, Attorney Schneider held himself out and his statement I put on my page 22 of the brief. And basically, Your Honor, what it says basically is Basically, it's an oath. And the oath itself has in it certain things that a court would assume to be true. He basically states that he is duly licensed in the District of Puerto Rico and that he can make such affirmation. It's not an empty ritual. The court take and there should be no mis- Did you raise this in your suppression motion? Yes, I think I did, Your Honor. In fact, we had a suppression motion on I think in the suppression motion we did not know some of that information. We learned that later. We did have a suppression motion with respect to the statement. But at the time, we did not know what was his qualifications or lack thereof. So if you didn't raise it, that's the reason why you say you should be allowed to. Well, yes, Your Honor. We did file a motion to suppress the statement itself, and we had arguments on it. But we did not know at the time that he did not have the qualification. In fact, that he purposely misrepresented himself in that oath. Your Honor, what we're saying is it's not an empty ritual. It assumes that the United States is playing fair, and it is that basic misrepresentation that this court cannot allow because it has severe implications. Your Honor, the next argument we raised was the prosecutor's closing argument. It says basically it's a 403 matter. And the court had to evaluate the probative value versus unfair prejudice. I believe the court has instruction from United States v. Young that gives the three criteria to analyze that. First, it says that you must look at the scope of the comment itself. And whatever curative instructions was given by the trial judge and the strength of other evidence against the defendant or the appellant are more. Well, let's take it for what it is. First of all, we know there was no curative instructions given, even though that was requested by Appellant Moore during the trial itself, that some curative instruction be given. The court didn't give it. The second thing is the strength of the other evidence. Even the government, in its response, point out to and they claim that there were other evidence against Mr. Moore. The only two things that the government pointed out, just like the appellant, is that a witness testified that during the incident at Wendy's that happened within split seconds, they heard somebody say, let's go, Troy. It's questioned whether he said, let's go, Troy, or let's go, boy. But he says, let's go, Troy. The second thing is also the same jailhouse wiretap conversation that we just raised. Those are the only two issues. There had been no fingerprint, no eyewitness, no fiber, no DNA, nothing linking Mr. Moore to this whole incident. So, therefore, to bring us to the first standard, which is the scope of the comment. You have to look at the comment itself. The comment itself I put on page 22, where they show a picture of him and they recite this point. Now, what Your Honors don't know is that at the time of the closing arguments, this entire courtroom was packed with law enforcement officers sitting here in their uniform, and this poem was reiterated throughout. The trial judge, in fact, told the prosecutor, why would you bring such a poem before this court in what he considered to be almost an error-free trial at the end of a long trial? And so the trial judge himself had problems with it, but in spite of such problems, did not give any curative instructions. This was a highly charged incident. It was well-publicized, and I think that the statement raised or went to the prejudice and inflamed passion, and it was precisely put there by the government. Your Honor, I think that that in itself borders on misconduct, and as such, denied Mr. Moore the impartial jury that's required. It goes to his substantive due process right. The last argument we raised, Your Honor, is the fact that there was insufficient evidence to convict Mr. Moore, because the two pieces of evidence that we just challenged was, one, the statement in the jailhouse, and if Your Honors are to agree with me, that by itself, there's problems with that statement being admitted, based on the way it was derived. And secondly, that the only other evidence before him was someone saying, in the heat of one witness saying that a co-defendant said, let's go through it. Now, no other evidence. No other evidence linked Mr. Moore to this incident. There's nothing else. If there's no issue or problem with the admission of the tape, as a participant in the conversation, you don't have the same argument that counsel has on behalf of Mr. Rodriguez, I presume. No, we don't, because – no, we don't. We don't have the same argument. Okay. Members, we'll have you back on rebuttal. Thank you. Mr. Romano. Good morning, Your Honors. Good morning. John Alex Romano on behalf of the United States and the Government of the Virgin Islands. With the Court's permission, I'll begin by addressing the challenge to the closing arguments before addressing some of the other claims that were discussed here this morning. The Government agrees that error occurred in two instances during closing arguments, with the recitation of the poem about Officer Chapman and with the brief reference to an ankle bracelet that occurred on one of the Government's PowerPoint slides. But both errors were harmless considering the context and scope of the reference in question, the District Court's instructions to the jury, and the strength of the Government's evidence against the defendants. And I'll begin by discussing the poem. The District Court found that the poem was a minor aberration in a prolonged trial, and I really do think that the record bears that out. The poem occupied less than half a transcript page of a lengthy summation, and the fact that it occurred during summation rather than rebuttal meant that the Defense Counsel's own closing arguments would have blunted any prejudice that came out of it. I understood Mr. Rivers, Counsel for Mr. Troy, to say that the poem was read repeatedly, and while the photograph of Officer Chapman was shown, it was only read once, and the photograph of Officer Chapman that is separately being challenged was in fact shown during rebuttal, not during summation, but when the poem was being read. That is my understanding of the record. Moreover, the content of the poem- Does it make any difference if it was? What if it was being shown during closing? I'm sorry? What if it was being shown during closing? If the poem was being read while the photograph was up? Yes. I think there would be an argument for a little greater prejudice. I don't think it would be enough to overcome our arguments about harmless error, but I think there would be a different argument there. The poem didn't demonize the defendants. While it inappropriately focused on Officer Chapman's service to the community as a police officer, it was not demonizing them, and the prosecutor did in fact tell the jury, he was not asking for sympathy, he was asking them to look at the evidence, and he said this repeatedly, and to convict the defendants based on the evidence. And so we think the district court's finding that this was not evidence of a trial that was dominated by passion and prejudice should be accorded a fair amount of discretion given the district court's having presided over this entire trial and was able to take the temperature of the courtroom. Moreover, the district court, while it did not give a curative instruction about the poem, none was in fact requested by the defense, but it did instruct the jury not to put sympathy, bias, or emotion to affect its deliberations and to base its verdict on the evidence. And finally, the evidence against both Defendants Rodriguez and Moore, who were the ones raising this claim about the poem this morning, was quite strong. And I'll just mention a couple of highlights. With respect to Defendant Rodriguez, his thumbprint is found on the license plate that is attached to the abandoned getaway car. You have Defendant Moore identifying Defendant Rodriguez in his jailhouse conversation  You also have Mr. Rodriguez's later admission to his girlfriend, Cynthia Cooper, later on in 2004 that he was in fact involved in the attempted robbery. And you have Mr. Rodriguez's use of the first carjacking victim's cell phone the day after the April 17th crime spree. As to Defendant Moore, of course, you have the Title III evidence, which is quite strong, where he's repeatedly referring to shooting Officer Chapman. You have the eyewitness testimony of Karine Davis inside the Wendy's who says after Officer Chapman was shot, one conspirator says to another, Troy, let me go. Troy is a reference to the person who defended Moore. You also have Defendant Moore using Lydia Keynes' cell phone on April 18th to make a call to an acquaintance. And you also have his false statements to the police, which shows consciousness of guilt. So we think, and those are again just the highlights, but we think the evidence against both Defendants was quite strong and also tilts in favor of a finding of harmless error. I'll ask this Court if there's any questions about the other three allegations of error, the ankle bracelet, the photograph of Officer Chapman, and the question of the reference to Rodriguez writing letters from prison. I can just address them quite briefly. The ankle bracelet reference was harmless. It was questionable whether the jury even saw the reference. This is on the fourth bullet point of a five-bullet point slide, and the government immediately moved on when it noticed the reference. And again, the evidence against Rodriguez was quite strong. Can you go to double jeopardy? Certainly, Your Honor. I can skip ahead to double jeopardy. The imposition of the consecutive life sentences on counts five and six did not violate double jeopardy. The government agrees with Defendant Berrios that in this instance, applying the block murder rule in this case, that felony murder under territorial law is a lesser included offense of causing death through use of a firearm under 925J. But double jeopardy is not violated where Congress intended multiple punishments for the greater and lesser offenses, and we submit that that's what Congress intended here by requiring that a sentence for using a firearm during a crime of violence must be served consecutively to any other sentence. The government does view 924J as a freestanding offense, not as simply a sentencing factor. We do not believe that that is dispositive of whether or not the consecutive sentence mandate that applies to a straight 924C offense applies under 924J. We believe that it does because in order to prove a 924J offense, you have to prove a 924C violation. And, in fact, if you look at the indictment in this case, count six, which is the 924J count, does charge, in the course of charging that everything was in violation of 924J, it does charge that a violation of 924C occurred. So we submit that the opposite concluding, concluding that the consecutive sentence mandate does not apply under 924J would yield a serious anomaly. It would mean that the only time that a defendant who violates the firearm provision is subject to a mandatory consecutive sentence, the only time that he's subject to that mandatory consecutive sentence is when the firearm violation does not result in death. And we think it's very difficult to fathom that Congress would have intended that result. As for the reference to Section 84 of the Virgin Islands Covenant, we do not believe, this is the citation that was provided by Counselor Mr. Berrios in the 920, sorry, in the recent 28J letter, we do not believe that that statute changes the analysis. We view it as simply applying to a successive prosecution, similar as Judge Fischer, as you were saying, similar to the Pettit rule. It simply precludes where there has been a prosecution under federal law that results in either an acquittal or a conviction, that there cannot thereafter be a prosecution in Virgin Islands Court. So we do not believe that that changes the double jeopardy analysis that we have set forth in our brief. I'm happy to address any other topic. I was going to spend a little bit of time on the Confrontation Clause issue. If you would. The admission of the recorded jailhouse conversation between Moore and Berrios did not violate the Confrontation Clause right of Mr. Rodriguez because the statements by Moore and Berrios were not testimonial. We think that's quite clear from this court's decision in Hendricks, which involved a recorded Title III conversation between a CI, a confidential informant, and a defendant. It's also clear, we think, from Davis v. Washington, the Supreme Court's decision in 2006, where the court indicated that statements from one prisoner to another are clearly non-testimonial. So because these statements by Moore and Berrios were not testimonial, they did not violate the rule in Crawford or the rule in Bruton. Bruton is based on the Constitution, on the Confrontation Clause, and the Supreme Court has made clear in the trilogy of cases since Crawford, of Davis v. Washington, Workton v. Bochting, and most recently Michigan v. Bryant, that the Confrontation Clause only applies to testimonial hearsay. Non-testimonial hearsay is only subject to restrictions under the federal and state rules of evidence. What about the Roberts v. Ohio case? Does it still live on? Your Honor, we submit that it does not live on. And in several of the cases from other circuits that we've cited for the proposition that Bruton doesn't apply to non-testimonial hearsay, I think make that quite clear, if I'm recalling those cases correctly. Our jurisprudence has not made that clear yet, has it? We agree with that, Your Honor. There is a 2007 case, Albrecht v. Horn, which suggests that Ohio v. Roberts lives on with respect to non-testimonial hearsay. But the Court there actually based that statement on a 2005 case, the Hendricks case, which actually comes before Davis v. Washington, Warton v. Bochting, and Michigan v. Bryant. So we think that those— I've reiterated the case of U.S. v. Jimenez. That's true, Your Honor. But I would note, we do not believe that this panel is necessarily bound by that. Because those cases didn't cite or discuss the Supreme Court precedent, and I believe we've cited in our footnote an unpublished decision that suggests the interpretation that we're advocating for this Court. So because those Jimenez and Albrecht didn't discuss the Supreme Court precedent, and since there is also, in fact, a 2010, the Michigan v. Bryant comes after those cases, we think that the panel would have discretion to adopt the interpretation that we're advocating. Hasn't our Court merely said that we need to assess the reliability of the statement? It does, and that certainly was what Ohio v. Roberts, that was sort of the gravamen of that test. Even if the Court were to look to that, we think that the statements here between Moore and Barrett were very reliable, not only as to themselves, but also as to the person who they identified. You acknowledge their hearsay? Yes, Your Honor. What hearsay exception allows them to be properly admitted? Sure, Your Honor. I would just say one threshold question. We didn't understand Defendant Rodriguez to be challenging admissibility under the rules of evidence. If we're wrong about that, then certainly the analysis should be performed. There are two bases under the rules for admitting this evidence. One would be the 804B3, the exception for a statement against penal interest. This Court in Musari applied that exception. To Rodriguez? Yes, Your Honor. As long as it is – Go ahead. Grab it. I'd love to hear this. – from Musari here. As long as the statements were self-inculpatory – and I'll actually read a quote. I don't have the page cite from Musari. But it says, where statements inculpate both the speaker and the defendant challenging their admission, the statements are admissible so long as they were self-inculpatory and not simply self-serving attempts to deflect criminal liability. And here, that's what you have with these statements. In identifying Defendant Rodriguez as the getaway driver, Moore and Berrios weren't suggesting that they weren't at all involved. They were – if you'll forgive me, I think at one point they even make a reference to – as this is page 4 of the transcript says, I tell the man, I tell Rodriguez, don't hit the tire, don't hit the tire, you're going to blow the tire. So they're not distancing themselves from the crime in the course of referencing Defendant Rodriguez as the getaway driver. So in that instance, we would view it as being admissible as a statement against interest that could be applied as to Rodriguez. If it doesn't, there's also, of course, the catch-all exception, which is what the district court found that the recorded conversation was admissible. The district court didn't use 804 at all, right? That is correct, Your Honor. It actually conducted the catch-all exception analysis in the course of – it almost sort of wasn't part of its analysis under the Ohio v. Roberts. I presume that in the following scenario, you say at the back end, harmless error. If we looked at the 807 analysis and decided that it was an abuse of discretion, I presume you'd argue – oh, it's not constitutional, so you wouldn't argue a harmless error. If there were error under the rules, and this was in the court where we find that Mr. Rodriguez had properly presented his claim under the rules of evidence in his brief, there would be some analysis that would need to be done for harmlessness since it's non-constitutional error, since it's non-testimony of hearsay, then the burden is lower. In light of all the other evidence against Mr. Rodriguez, his thumbprint, his admission to that girlfriend, his use of the phone, we think there's quite a lot of evidence against Mr. Rodriguez of taking out the Title III evidence. Okay. Unless this court has questions about any other issues, the government would – What about the carjacking question that was raised by Mr. Cole? Yes, Your Honor. We submit that there was no instructional error here on the intent element. The district courts – as Your Honors know, jury instructions need to be read as a whole. As a whole, the instructions required the jury to find that the defendants actually intended to cause death or serious bodily harm, and it required the jury to make that finding, judging the defendants' conduct objectively. Now, Mr. Berrios has focused on one clause in the jury instructions, directing the jury to consider, quote, what one in the position of the alleged victim might reasonably conclude. But that is still an objective standard. It's what a person in the standpoint of the victim might reasonably conclude, and it's also what they might reasonably conclude about the defendant's intent. We're not asking here for a finding with respect to the intent element as to whether or not the actions of the defendants put the victim in fear. It simply emphasized that all the evidence of intent should be considered, and it simply, in this instance of this one clause, directed the jury to consider one particular standpoint from what the alleged victim would conclude about the defendant's intent. I'm sorry. Is it your understanding that Mr. King did not preserve the evidentiary argument with regard to the taped conversation as it relates to Mr. Rodriguez? Your Honor, he did object and disreport. So my reference, and I apologize for not being clear about it, was on appeal. The government had not understood him to be challenging admissibility under the rules of evidence. We understood him only to be challenging it, sort of raising a confrontation clause question. We have analyzed it. Defendant Cruz is not here today, and I won't go into the merits of his claim, but he did raise an argument under the rules of evidence. So we have responded to that argument in our brief. Mr. Romano, just one other question I'd like you to perhaps comment on. The certification on the Title III application by the AUSA who was not admitted in Puerto Rico, how did that happen? Yes, Your Honor. We believe that it was, waiver issues aside, that it was a correct representation. I'm sorry, is Your Honor asking more for the logistics or for me to get into the merits? No, the merits. The claim, as I understand Mr. Moore to be making, was the same one made by Mr. Berrios after trial, which is that the attorney applicant, Schneider, made a misrepresentation by identifying himself as an attorney or law enforcement of the United States. Now that term appears in 18 U.S.C. 2518.1a, but he correctly identified himself. This was an attorney in the criminal division who was authorized by the Attorney General to prosecute federal offenses. Whether or not he was admitted to practice before the District Court of Puerto Rico does not go into the meaning of that statutory term. That simply refers to his authority. A local rule of the District Court could not authorize him to prosecute a federal crime. I understand. That authority comes from the Attorney General, and certainly the District Judge in Puerto Rico had discretion to waive a compliance with rules in the ward given the matter that was under investigation or exigent circumstances here. Do you have anything else? I would just say, with respect to turning back very briefly to jury instructions on the carjacking offense, we submit that any instructional error, we don't believe there was any, was harmless given the weight of the evidence of intent on all three carjacking offenses. So we would ask the Court to affirm the convictions in this case. Thank you. Mr. Cole, I think you have two minutes. Yes, Your Honor. With respect to the double jeopardy, I don't understand the government's argument. They accept the Julian rationale, the 11th Circuit case, that said that consecutive sentences were not required, but they want the Dinwiddie and Battle, that's the 8th, 2nd, and 10th Circuit results. It doesn't make any sense at all, because the 8th and 10th Circuit specifically based their decisions on the notion that 924J was merely a sentencing instruction with respect to a 924C violation. Well, what about his argument that in the absence of this application, you'd have the anomaly that murder would be the only one where there wouldn't be the consecutive, you wouldn't have a consecutive sentence? Your Honor, I don't think Congress was concerned about it because what Congress was doing was creating a separate crime in which they could authorize the death penalty, life imprisonment, or any term of years. So I don't think they were concerned with consecutive sentences or multiple punishments. I don't think it just came in, I don't think it was part of their reasoning. And the point is, again, if you accept Julian, I think that you have to accept the idea that there was no congressional intent to impose consecutive sentences on 924J. Just briefly with respect to the carjacking instruction, Your Honor, what the victim might reasonably conclude from his position is in fact a subjective standard. That is the definition of a subjective standard. And when you say you're to determine a fact objectively based on an objective standard, that says you're to determine that fact subjectively. I don't see how that construction makes any sense at all. And I would simply point out that the evidence was that in the one instance in which resistance was offered in the attempt at hijacking, there was no harm to that victim. Thank you. Okay, Mr. King, you have two minutes. Thank you, Your Honors. There are just a couple of things. First of all, the government agrees that there was error with respect to the poem, error with respect to the ankle bracelet, or I believe error with respect to letters from jail. With respect to the poem in particular, the district court noted the following, that in the instant case the appellant recited a poem, the poem is not strictly based on the evidence and its potential effect was to evoke the passion of the jury. The court specifically found that the recited poem pushed the bounds of approved advocacy in a number of respects. In the brief, I talk about a case, a Potter case, in which it talks about the cumulative effect of multiple prosecution misstatements and provides this situation where a single misstep might be harmless error, multiple missteps may constitute a violation of due process. The court noted trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law. The cumulative effect analysis has two elements. One, that at least two errors were committed in the course of the trial and that considered together, along with the entire record, the errors so infected the jury's deliberations that they denied a petitioner a fundamentally fair trial. That's what we're saying happened here, that the petitioner was denied a fundamentally fair trial on the basis of what was stated by the government in its closing statement and what was stated by the government with respect to these individual errors. Now, the government has made certain, talked about the evidence that exists in this case. Well, if we talk about the fingerprints, there was a, out of a possible 150 point comparison, the government expert was only able to point to eight potential points of comparison that he said cited Mr. Rodriguez. The second thing is the government talks about an admission of guilt to his girlfriend. The record does not reflect that there was ever any such admission. The final thing that I want to address is that whether or not I raised in my brief the issues concerning the evidentiary findings. I believe I did. It may not have been the greatest terms. It may not have been in a paragraph that said this is the evidentiary portion, but I certainly said throughout my entire brief that the problems in this case exist in several forms. The first is that this thing is hearsay and doesn't fall with any exception to the hearsay rule. The second portion, which I felt to be more compelling, was to continue to argue the idea that the confrontation clause aspect of this was primarily important. It's important not just to the hearsay rule argument. It's important because the Constitution requires it, due process requires it. Thank you. Thank you. Thank you. Mr. Rivers, you have one minute on rebuttal. Clearly, what I want this Court to remember most of all is this. The poem tugs at the heart string of the juror by invoking emotion such as sympathy, passion, and ultimately anger. The courtroom at the time was packed. There was not a single seat in here. Eighty percent of it was law enforcement officers. This was the poem that came out by the government on rebuttal, and it came out at a time that the defendants had no opportunity. They had already argued in its closing statement. This is the government coming up, taking their last shot. Not even the defendant to the attorney could have said anything about it other than raise it with a judge. And, Your Honor, we argue that the judge didn't give any curative instructions, and you have to take it. But you didn't ask. Neither you nor your colleagues asked for any, did you? Judge, I am sure that I did. I'm not quite certain, but I believe I did. But not only that, the government in its response brief before this court state, on page 29, the evidence proving most participation, and they listed them. One is the recording in the jail, and two, some witnesses at the shooting or at the incident, somebody said, Troy, let's go, and they claimed that a phone call was on a cell phone of one of the hijacked victims. No other evidence, not even an inkling of any other evidence. No eyewitness, no fingerprint, no fiber, no DNA, nothing. And that is what we're saying. We're saying that, and this court should take back with it the dictates on the burger, which says, look, the government could fight strong blows. They could give it away, but they won't. But it shouldn't be fouled. And we also join Brother Counsel's argument to the extent that they apply to the appellant. Thanks. No. We want to thank all counsel for an excellent argument and advocacy in this case, and we will take the respective matters under advisement.